UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ALLEN LEE SURPRISE,

        Plaintiff,

v.                                                   Case No. 13-C-912

CAROLYN COLVIN,

        Defendant.

**DECISION AND ORDER**

Plaintiff Allen Lee Surprise challenges the decision of the Commissioner of Social Security denying him disability benefits. Plaintiff's challenges to the ALJ's analysis of the medical evidence are rejected. But because the transcript of the testimony of the vocational expert is of such poor quality, the Commissioner's decision will be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g).

**I. Background**

Plaintiff was in a snowmobile accident in 2000 and experienced chest trauma and pneumothoraces. This caused him to have chest pain due to broken bones. In 2009 he injured his middle finger on his right hand (dominant hand) and experienced severe pain and reduced flexion in that finger. By 2010 Plaintiff had chronic back and neck pain due to various accidents, as well as what is described as an assault. (R.500.) He was diagnosed with scoliosis and, in a physical therapy evaluation, the therapist noted average reported pain of 8/10, numbness and tingling in legs,

stomach upset with pain, and occasional dizziness with sudden movements. (R.496.) He continued to report numbness and tingling, as well as sharp jolts of pain in the left shoulder and arm, as well as needing occasional assistance with dressing and bathing. (R.615.) Driving was difficult because he could not turn his head independently of his body; it "feels like bone grinding on bone when he turns his neck." (R.568.) The chronic pain led to depression and anger. (R.712, 757.) By 2012 the pain was "3x worse" after a fall. (R.754.) In addition to his physical limitations, Plaintiff had learning disabilities and / or dyslexia, and stated that he was unable to read. Over the years, his providers prescribed him narcotic pain medication, physical therapy, medial branch nerve blocks and epidural steroid injections.

The ALJ found that Plaintiff was not disabled because, despite his mild and moderate impairments, he retained the residual functional capacity (RFC) to perform light work "with no more than frequent overhead reaching or occasional fine manipulation with the right hand" with avoidance of pulmonary irritants. (R.28.) In addition, the ALJ imposed restrictions on contact with the public and coworkers, and the ALJ also noted Plaintiff's inability to maintain concentration necessary to perform complex tasks. In practical terms, this meant the Plaintiff could perform jobs like food preparer or parking lot attendant, according to the vocational expert (VE). (R.34-35.)

**II. Analysis**

The Commissioner's decision will be upheld if it is supported by "substantial evidence," meaning " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Moore v. Colvin,* 743 F.3d 1118, 1120–21 (7th Cir.2014), quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971). "This deferential standard of review is weighted in favor of

upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision." *Moon v. Colvin,* 763 F.3d 718, 721 (7th Cir. 2014). "The ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination. *Id.*

**A. Vocational Expert Testimony**

Plaintiff first argues that the vocational expert's (VE) testimony does not constitute substantial evidence supporting the ALJ's decision because the record is too spotty to allow review of any potential conflict between the Dictionary of Occupational Titles and the VE's testimony. Under SSR 00-4p, the ALJ must ask the vocational expert whether his testimony is consistent with the DOT and must resolve any discrepancies that exist between the DOT and the vocational expert's testimony. In *Overman v. Astrue,* the Seventh Circuit explained as follows:

> Under SSR 00–4p, an ALJ has an "affirmative responsibility" to ask whether a vocational expert's evidence "conflicts with information provided in the DOT" before relying on that evidence to support a determination of nondisability. SSR 00–4p at 4; see *Massachi v. Astrue,* 486 F.3d 1149, 1152–53 (9th Cir. 2007); *Prochaska v. Barnhart,* 454 F.3d 731, 735 (7th Cir. 2006). Here, the ALJ satisfied this first step by asking the VE if his testimony was consistent with the DOT; the VE answered (wrongly, as it turns out) that it was. If evidence from a VE "appears to conflict with the DOT," SSR 00–4p requires further inquiry: an ALJ must obtain "a reasonable explanation for the apparent conflict." SSR 00–4p at 5.

546 F.3d 456, 462 -463 (7th Cir. 2008).

Here, the ALJ asked the VE if there was any conflict between his testimony and the DOT. (R.91.) The response, however, is shown in the transcript as "inaudible," and thus the Plaintiff argues that the case must be remanded to explore the question further. After the "inaudible" response, the ALJ finishes his questioning and cedes the floor to Plaintiff's counsel:

3

> Q Thank you. Mr. Duncan – or one question. With the exception of the sit-stand that's not addressed in the DOT, has [sic] your answers been consistent with the DOT and related sources?
>
> A [INAUDIBLE].
>
> ALJ: Thank you. Any questions, concerns, comments, hypotheticals, Mr. Duncan?

(R.91.)

Although the VE's response was inaudible, the context strongly suggests that the actual response was "yes." Had the answer been "no," that it was *not* consistent with the DOT, the VE would likely have elaborated on his answer or the ALJ would likely have probed further to learn what the discrepancies might have been. Instead, the ALJ summarily wrapped up his questioning and allowed Plaintiff's counsel to begin. This suggests that the VE answered "yes," as would be expected, but I am reluctant to find an inaudible response is substantial evidence. In addition, the inaudible answers continued in counsel's questioning of the VE and the attempts to clarify and follow-up on responses he gave. The question was not simply whether the VE gave the required answer in direct, but whether when challenged as to his answer or asked to explain further he was able to offer reasonable responses to support his answer. Given the poor state of the transcript of the VE's testimony, it is impossible to tell. Accordingly, a limited remand is necessary to allow the Commissioner to provide a complete and intelligible transcript of the VE's testimony or, alternatively, to conduct a rehearing at which the same or a new VE can testify.

**B. Treating Source**

Plaintiff also argues that the ALJ erred by not giving controlling weight to his treating physician, Dr. Mindy Frimodig. Dr. Frimodig found, among other things, that Plaintiff could sit for 15 minutes and stand for 45 minutes, and he would need 5 minutes every 15 minutes to "walk

4

around," as well as unscheduled breaks. (R.559-67.) In addition, he could only stand four hours in a day and sit for two hours. He would also be expected to have four or more absences per month. Plaintiff argues that, if credited, the restrictions imposed by his doctor would preclude full-time, sustained work.

Under 20 C.F.R. § 404.1527(c)(1), an ALJ should "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." A treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). This does not mean the ALJ must accept the treating source's opinion as controlling, but the ALJ must provide a sound explanation for his decision to reject it and instead adopt the opinions of others. *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013).

The ALJ cited several reasons for giving little weight to Dr. Frimodig's opinion. First, her belief that he would be constantly in pain was inconsistent with his reports of daily activities, which included raising his daughter, cleaning the house, driving, etc., which he would not be able to perform if the pain were as severely limiting as she claimed. (R.32.) The doctor's belief that he should be limited to low-stress jobs was undermined by the fact that Plaintiff claimed he handled stress okay. Her assertion that he could only sit for fifteen minutes at a time, up to two hours per day, was belied by the fact that Plaintiff had only mild degenerative disc disease and a full range of motion in his lower extremities, as well as no motor or sensory deficits. (*Id.*) The ALJ also pointed out that he showed consistent performance in his functional capacity evaluation, which suggested he would be able to work forty hours per week.

5

The ALJ's rejection of Dr. Frimodig's opinion was based largely on his finding that Plaintiff was less than fully credible, a point the Plaintiff glosses over. For example, the ALJ noted that Plaintiff always denied using drugs, but then tested positive for marijuana. (R.31.) Making matters worse, he then told the ALJ the positive test was due to second-hand smoke, an excuse the ALJ rejected out of hand, further weakening the Plaintiff's credibility. More importantly, the ALJ also believed Plaintiff had exaggerated his mental health symptoms (mainly anxiety) because his statements during the consultative exam contrasted with his actual activities. And there was also evidence that he exaggerated his physical limitations, as discussed further below. Finally, Plaintiff exhibited narcotic-seeking behavior and sometimes lied to providers in an effort to get more narcotics. (*Id.*) For example, on February 9, 2012, Plaintiff visited Richard Sarnwick, DO, who recorded the consultation as follows:

> He says his back is still hurting him. He then went on to say that he gets Vicodin and Percocet prescribed by a nurse practitioner in Gillett. . . . Al apologized to me because he says "I forgot to tell you about it last time". It certainly was a surprise, because last time he did not tell me many other things. Today, he wanted to get it "in the record" that he has never asked me for narcotics. This is not true either. Last time he was here he was asking for narcotics. The new issue this time is that he has been seeing a practitioner in Gillett for a long time apparently and he asked if I would prescribe the pain pills for him. I told him I would not do that. . . . Anyway, we went around in circles once again and he was once again withholding information about different practitioners he has been seeing for his narcotics.

(R.830.)

During the previous visit with Dr. Sarnwick, Plaintiff admitted to taking an "old Vicodin" only after being told he needed a urine scan, and Dr. Sarnwick noted the duplicitous nature of the revelation. Dr. Sarnwick also noted that "he drove his car here. His wife comes in with him and Al says that he does not drive the car." (R.839.) Thus, not only was he dishonest in seeking

6

narcotics, but also in reporting his limitations, with an apparent effort to deceive his care providers about his abilities. There was also evidence of an effort to cleanse "the record" regarding the narcotics, which Dr. Sarnwick rejected. The ALJ cited both of these medical records in discounting the Plaintiff's credibility.

Plaintiff (not surprisingly) does not challenge these credibility findings in his appeal, but they are part-and-parcel of the ALJ's decision to place little weight on the treating provider's conclusions. For example, the ALJ noted that the Plaintiff's alleged need to take unscheduled breaks, miss four days of work per month, and walk around every fifteen minutes were based largely on Plaintiff's own subjective complaints about pain, and there was no objective evidence supporting such drastic limitations. (R.32-33.) These largely self-reported limitations form the essence of Dr. Frimodig's conclusions about Plaintiff's condition. The ALJ was within his rights to believe that if the Plaintiff would exaggerate his symptoms during a consultative exam and make up excuses about his drug use during his effort to get disability benefits, he would similarly exaggerate those symptoms when talking to his doctor. *Bates v. Colvin,* 736 F.3d 1093, 1100 (7th Cir. 2013)("The question of which physician's report to credit thus collapses into the credibility issue; because the ALJ found that Bates was not credible in her reports of pain, she also gave Dr. Cordero's opinion, which relied heavily on these reports, little weight.") And when one considers the evidence suggesting that Plaintiff might have been trying to pad the medical record by implying that his wife had to drive him to the doctor's office, and that he had attempted to clean up the records surrounding his narcotic use, the ALJ's discounting of Plaintiff's credibility appears even more reasonable. In fact, it would be hard for an ALJ to ignore the Plaintiff's credibility issues, especially in the face of an absence of strong objective evidence.

7

It is also important to note that the ALJ's discounting of the treating source was not made in a vacuum. Instead, the ALJ cited a number of other pieces of the medical record that were far more persuasive. Most notable was the two-day functional capacity evaluation Plaintiff underwent. The examiner noted that Plaintiff would be able to perform sustained work for 40 hours a week with only a few limitations due to his trunk and neck stiffness and problems with the left shoulder. (R.577-78.) The extensive records of the exam indicate mostly normal performance on functions including lifting, standing for thirty minutes while performing activities, pushing and pulling, etc. (R.575-95.) He was unable to kneel for very long, for example, but was able to walk for 6 minutes (R.585) and he could stand for 30 minutes while performing intermittent functions. (R.593-94.) He also had limited coordination with his hands and limited grip strength, particularly in the left hand. (R.578.) The examiner found five limitations: (1) waist to crown and front carrying; (2) fine motor coordination; (3) ladder and stair climbing; (4) walking tolerance; and (5) left elevated work. The examiner also noted that "performance was consistent between Day 1 and Day 2. This indicates that work ability should be able to be sustained on a day to day basis." (R.576.) The ALJ reasonably viewed this evidence as much more persuasive than the more cursory notes of Dr. Frimodig.

The ALJ also cited the opinion of Dr. Foster, the state agency reviewer. Dr. Foster concluded that Plaintiff would be restricted in his reaching ability, but otherwise had "normal strength" (R.547), and normal abilities in grasping, manipulating, climbing stairs, sitting, standing, and lifting. (R.541-42.) Dr. Foster also noted the fact that Plaintiff has never required surgery on his spine or shoulders, and that imaging tests had been benign, apart from noting scoliosis. (R. 547.) The ALJ also considered the opinion of Dr. Khorshidi, another state agency physician, but rejected it to the extent Dr. Khorshidi believed Plaintiff could perform medium work. The ALJ, noting some

8

lifting trouble Plaintiff had during his consultative exam, ultimately found that Plaintiff could perform only light work. (R. 32.)

In sum, the ALJ's opinion demonstrates that he considered and weighed a number of medical sources, and examined in detail the report from Plaintiff's two-day consultative exam, which was suggestive of an ability to work at a sustained pace. The treating physician's report was unsupported and devoid of any meaningful explanation, particularly for the surprisingly severe limitations it imposed. For example, the supposed need to miss four or more days of work per month does not find any support in the record at all, because there was no evidence that Plaintiff's condition was so debilitating that he required bed rest or experienced the kind of pain that would render him incapacitated for lengths of time.

### C. Functional Capacity Evaluation

Finally, Plaintiff argues that the ALJ erred by placing "significant weight" on the functional capacity evaluation (FCE). For example, he believes the ALJ erred by mischaracterizing the FCE and concluding that Plaintiff could perform "heavy" lifting. That is not true. The ALJ stated that Plaintiff "had heavy and maximum abilities for lifting for floor to waist and front carry" (R.31), which is a verbatim statement taken from the FCE itself. (R.576.) It is unclear why Plaintiff believes that was error, given that the ALJ appeared to be *quoting* the FCE rather than mischaracterizing it. In any event, the ALJ also noted that "claimant had limitations with frequent front carrying of heavy weights during Functional Evaluation." (R.29.) "Therefore, due to the claimant's low back pain . . . the undersigned further reduces the claimant to light exertional work. This provides him with the benefit of the doubt." (R.30.) Accordingly, it should be clear both that the ALJ did not believe the Plaintiff could lift heavy weights with any regularity, and equally clear

9

that the ability to engage in heavy lifting was not part of the RFC. As such, there is no reason to remand for further proceedings.

Plaintiff further argues that the ALJ ignored the FCE's conclusions finding that Plaintiff could only "occasionally" perform elevated work on his left side, kneel, go up ladders, etc. It is not clear, however, what Plaintiff believes the ALJ should have done with these limitations. The ALJ imposed an RFC limiting overhead reaching and fine manipulation with the right hand, as well as other limitations not relevant here. The Plaintiff has not cited any authority suggesting that an ALJ must inquire about every specific mild or moderate limitation found in an FCE. Presumably anyone undergoing a functional capacity examination will have strengths and weaknesses, and the weaknesses are only relevant to the extent they might limit the kinds of jobs available at a given exertional level. It is true that the ALJ did not ask the vocational expert about every one of the "occasional" limitations found in the FCE, but there is no indication (and Plaintiff offers no explanation) that the limitations in question (e.g., the need to only occasionally use ladders) impacted the kinds of jobs the ALJ found Plaintiff could perform. These jobs included food preparer, coin machine collector, office clerk, parking lot attendant and escort vehicle driver. (R.35.) None of these jobs would involve significant amounts of walking, kneeling, climbing ladders, or any other of the "occasional" limitations Plaintiff cites from the FCE.

In sum, the ALJ's reliance on the FCE was not error.

**III. Conclusion**

For the reasons given above, the decision of the Commissioner is remanded so that a full and complete record of the VE's testimony can be made or, if that is not possible, for a rehearing at

which the same or a new VE can testify. The Plaintiff's motion for summary judgment is **GRANTED**.

One further matter deserves comment. The briefing letter sent out in this case limited the parties' opening briefs to twenty-five pages, absent leave of the court. Plaintiff's brief exceeds forty pages, and no leave was sought so far as the record shows. Counsel for Plaintiff is cautioned that in the future failure to comply with the page limitation set forth in the Court's briefing letter could result in striking counsel's brief in whole or in part.

**SO ORDERED** this   25th   day of November, 2014.

                                                  s/ William C. Griesbach
                                                  William C. Griesbach, Chief Judge
                                                  United States District Court